*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
ELECTRONIC CITATION: 2001 FED App. 0221P (6th Cir.)
File Name: 01a0221p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

JEFFREY DEWAYNE CLARK,
    *Petitioner-Appellant,*

    *v.*

    No. 99-6620

MICHAEL O'DEA,
    *Respondent-Appellee.*

Appeal from the United States District Court
for the Western District of Kentucky at Louisville.
No. 98-00766—Charles R. Simpson III,
Chief District Judge.

Submitted: May 2, 2001

Decided and Filed: July 16, 2001

Before: JONES, SILER, and GILMAN, Circuit Judges.

———————————

**COUNSEL**

**ON BRIEF:** Perry T. Ryan, ASSISTANT ATTORNEY
GENERAL, Frankfort, Kentucky, for Appellee. Jeffrey
DeWayne Clark, Central City, Kentucky, pro se.

1

---

**OPINION**

---

RONALD LEE GILMAN, Circuit Judge. Jeffrey DeWayne Clark appeals the district court's denial of his petition for a writ of habeas corpus, filed pursuant to 28 U.S.C. § 2254. A Kentucky jury convicted Clark of first-degree murder in 1995. The state trial court subsequently sentenced Clark to a term of life imprisonment. We granted a certificate of appealability as to the following issues: (1) whether the trial court improperly admitted evidence of satanism, (2) whether the trial of Clark and his codefendant was improperly joined, and (3) whether the prosecution improperly withheld a letter written by a jailhouse informant. For the reasons set forth below, we **AFFIRM** the district court's denial of Clark's petition for habeas corpus relief.

## I. BACKGROUND

### A. Factual background

On April 2, 1992, Rhonda Sue Warford was reported missing by her mother. The Louisville police learned from the mother that Warford had recently dated Garr Keith Hardin, and that Clark was an associate of Hardin. Three days later, Meade County Deputy Sheriff Greer was notified that a body, later determined to be Warford's, had been found in a field off Highway 823 in Meade County. Her body was found lying face down, clad in white canvas tennis shoes, red sweat pants, a dark blue shirt, and a multi-colored jacket.

Upon examining Warford's body, the Chief Medical Examiner for the Commonwealth of Kentucky found many stab wounds to her back, a 1-inch cut on the surface of her right hand, and a 0.4-inch cut on her right index finger. He also observed a stab wound that pierced her lung through her upper right chest and stab wounds at the base of her skull, one of which severed her brain stem. Warford's injuries were caused by a sharp, single-edged instrument, such as a knife.

The examiner also saw that Warford had an inverted cross tattooed below her left clavicle.

During the investigation, the Meade County Sheriff's Department interviewed both Clark and Hardin. Clark denied owning a knife. He also claimed that the last time he had seen Warford was in December of 1991, and that he was with Hardin from the evening of April 1, 1992 through the next morning. Hardin admitted that he owned a knife, but claimed that the last time he saw Warford was on March 29, 1992, when he stayed at her house. He also claimed that he was with Clark from the evening of April 1, 1992 through the next morning, looking for Clark's lost snake and drinking beer.

The sheriff, however, determined that one hair from the victim's sweat pants had similar characteristics to the hair samples taken from Hardin. The fact that Warford's mother had washed the sweat pants shortly before Warford wore them on April 1, 1992 suggested to the police that Hardin had lied about not seeing Warford just prior to her death, because the hair could not have gotten on the sweat pants otherwise. In addition, the sheriff found one of Warford's fingerprints on Clark's car. The presence of the fingerprint was inconsistent with Clark's statement that Warford had not been in his car since December of 1991.

Search warrants for both Clark's and Hardin's residences were obtained. The sheriff found various occult-related items and documents at Hardin's residence, and knives at the residences of both. Clark was subsequently interviewed by the sheriff and arrested. An informant, Clifford Capps, claimed that he was housed in a cell with Clark. Capps later testified that Clark, on two different occasions, told Capps that he had killed Warford, once jokingly, and another time with a serious expression.

**B. Procedural background**

On May 7, 1992, the Meade County grand jury indicted both Clark and Hardin, charging each of them with first-degree murder. They were jointly tried before a jury in a

seven-day trial which lasted from February 27 to March 7, 1995. The jury found them both guilty of first-degree murder.

During the trial, several witnesses testified about Clark's and Hardin's satanic worship. Amy Padgett, an ex-girlfriend of Clark, said that Clark was once involved with satanic worship, that he owned numerous knives and guns, and that he had an inverted cross tattooed on his shoulder. She stated that Clark (1) told her that he would like to try killing a person because it would be a challenge to see if he could do it and get away with it, (2) explained how a person could be killed by a stab wound to the base of the skull, (3) took her to an area where he claimed a number of animal sacrifices had been made, and (4) was familiar with the area where Warford's body was found.

Another witness, Hope Jaggers, testified that she was Warford's best friend for a year prior to Warford's death. Jaggers said that she heard Warford tell Hardin that Warford was pregnant, and that Hardin responded by saying that "if you are pregnant, I will kill you and that [expletive] baby." In addition, she told the jury that she had once seen Warford cut her fingertips with a razor and rub the blood on Hardin. But when Jaggers was asked whether either Clark or Hardin was involved with satanism, she stated that she had no knowledge of such involvement.

Yet another witness, Shawn Lee Mattingly, a friend of Clark, testified that Clark almost always carried a knife with him, and that Clark called one of the knives a "sacrificial knife." Mattingly also told the jury that Clark had admitted to him that Clark had once sacrificed an animal in front of a church, an act that was reported on the local news.

Other witnesses denied having any knowledge of Clark's involvement in satanism. Two witnesses — Warford's sister and one of his cousins — said that they had never seen Clark or Hardin involved in any satanic acts. Warford's sister, however, testified that she knew that Hardin was involved in satanic worship. When Clark's mother and stepfather testified, they denied ever seeing an inverted cross tattooed on

Furthermore, even if the state had prior knowledge of Capps's letter, the letter does not meet the standard for granting habeas relief. On habeas review, a federal court must ask whether "the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). Capps's letter, however, was at best ambiguous as to Clark's guilt or innocence. Rather, its usefulness was limited to impeaching the credibility of Capps, which Clark already did during the trial. Because it cannot be said that "there is a reasonable probability that, had the evidence [of Capps's letter] been disclosed to the defense, the result of the proceeding would have been different," *Bageley*, 473 U.S. at 682, Clark's argument for a new trial must fail, even if the state had been in a position to disclose Capps's letter.

### III. CONCLUSION

For all the reasons set forth above, we find no merit in Clark's claims for habeas relief. We therefore **AFFIRM** the judgment of the district court.

copy of Capps's letter to Sheriff Greer. Sheriff Greer's own affidavit states that he had never been told of, nor received, a copy of any letter by Capps to Justis prior to Clark's motion for a new trial. He in fact denies having ever spoken to Justis. In addition, Deputy Sheriff Wise provided an affidavit stating that he had discussed the Clark case with Sheriff Greer many times prior to the trial. According to Wise, Sheriff Greer had told him that Capps had given a statement, "but that Kevin Justis had refused to speak to [Sheriff Greer]." Various other affidavits from the staff of the Breckinridge County Clerk's Office also support the state's claim that Justis had refused to speak to Sheriff Greer, and that Sheriff Greer did not have a copy of the letter. Furthermore, the Meade County Commonwealth Attorney stated in his affidavit that he had spoken to the Colorado prosecutor, and that nothing was ever mentioned to him about Capps's letter.

On habeas review, the state court's factual findings are accorded great deference. "In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 28 U.S.C. § 2254(e)(1). Thus, regardless of whether we would reach a different conclusion were we reviewing the case de novo, the findings of the state court must be upheld unless there is clear and convincing evidence to the contrary.

Given the existence of the numerous affidavits in support of the state's position, we are unable to conclude that Clark has provided clear and convincing evidence that the state court committed an error in making its factual determination that Sheriff Greer had not seen the letter in question prior to Clark's trial. Because the state was found to have no prior knowledge or possession of the letter, and therefore could not possibly have disclosed its existence, Clark's claim of prosecutorial misconduct must fail.

Clark's shoulder. Clark also denied that he was involved in the occult or in satanic practices.

On May 18, 1995, the state court entered judgment against Clark and Hardin, sentencing each of them to life imprisonment. This timely appeal by Clark followed.

## II. ANALYSIS

### A.   Standard of review

The Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996) (AEDPA), applies to Clark's case because he filed his habeas corpus petition pursuant to 28 U.S.C. § 2254 after the effective date of AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, 336 (1997). A federal court is authorized to grant a writ of habeas corpus to a person in custody pursuant to a state-court judgment, but only if

the adjudication of the claim -- (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

The Supreme Court has declared that "a federal habeas court making the 'unreasonable application' inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable." *Williams v. Taylor*, 529 U.S. 362, 409 (2000). In its elaboration on the meaning of the term "objectively unreasonable," the Court stated that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Id.* at 411.

Finally, a district court's denial of the writ is subject to de novo review. *See Rogers v. Howes*, 144 F.3d 990, 992 (6th Cir. 1998).

## B.    Admission of evidence about satanism

In his first claim for relief, Clark argues that the trial court violated his right to due process by permitting the state to introduce testimony that he and Hardin were involved in satanism, despite the lack of any physical evidence that the death of Warford resulted from a ritualistic murder. Clark contends that by admitting testimony about satanism, the state trial court violated Kentucky Rule of Evidence 404(a), which prohibits admission of "[e]vidence of a person's character or a trait of character . . . for the purpose of proving action in conformity therewith on a particular occasion."

The state, however, claims that it introduced the testimony not to show "bad character," but to support its theory that Warford's murder was motivated by the belief of Clark and Hardin that they would gain power by killing her. It points out that Kentucky Rule of Evidence 404(b) distinguishes evidence of "character" from that of "motive," and allows "[e]vidence of other crimes, wrongs, or acts . . . [i]f offered for some other purpose, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." In discussing this point, the Kentucky Supreme Court specifically stated:

A review of the record demonstrates that the Commonwealth presented evidence, other than that noted by [Clark], to substantiate its theory that Warford's death was motivated by the performance of a Satanic ritual. The fact that the Commonwealth's overall proof on this issue in retrospect was not strong does not detract from the initial admissibility of the evidence in question.

We agree with the Kentucky Supreme Court. There was testimony that Clark had specifically referred to one of his knives as a "sacrificial knife" and that, according to certain satanic teachings, worshippers could empower themselves by

Warford, thereby corroborating Capps's testimony and assisting Capps with obtaining his own release on probation. This letter was discovered by Clark after the jury returned its verdict, and was the basis of Clark's motion for a new trial. Clark maintains that he could have used this letter to impeach the credibility of Capps, who testified that Clark admitted to killing Warford. But the state claims that it was not even aware of this letter until Clark filed his motion.

According to *Brady v. Maryland*, 373 U.S. 83 (1963), "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment." *Id.* at 87. Evidence is material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bageley*, 473 U.S. 667, 682 (1985). The threshold issue in the present case, however, is whether the state had any knowledge of the letter prior to being informed of its existence in Capps's motion for a new trial. In its ruling on this issue, the state court found that the prosecution had no such knowledge.

There is evidence in the record strongly suggesting that the state in fact was aware of the existence of Capps's letter. Supplemental affidavits filed by Clark claim that Justis, to whom Capps's letter was sent, told a Colorado public defender, Harvey Palefsky, that he had shown Sheriff Greer the letter from Capps. Palefsky had been interviewing Justis in preparation for a different murder trial in which Capps and Justis were anticipated witnesses against a defendant that Palefsky was representing. Clark also filed the affidavits of three Colorado attorneys — Palefsky, another public defender, and a prosecutor — in which the attorneys swore that Sheriff Greer verbally acknowledged having a copy of the letter from Capps to Justis.

The record, however, also contains counter-affidavits indicating that Sheriff Greer was not aware of the letter. An affidavit by Justis, for instance, avers that he did not give a

Nor has Clark demonstrated that the Kentucky Supreme Court, in allowing Clark and Hardin to be jointly tried, based its decision on "an unreasonable application of . . . clearly established Federal law" as required for habeas relief. 28 U.S.C. § 2254(d). In a prior case, the Kentucky Supreme Court specifically declared that

> the mere introduction of evidence that is competent as to one defendant and incompetent as to the other is not in and of itself grounds to grant a severance. . . . [O]rdinarily, there must be some additional factor, such as that the defendants have antagonistic defenses, or that the evidence as to one defendant tends directly to incriminate the other, e.g., one defendant's admissions directly implicate the other.

*Compton v. Commonwealth*, 602 S.W.2d 150, 152-23 (Ky. 1980) (internal quotations omitted and brackets in original).

Here, Clark presented no additional factors. The evidence against Hardin — his satanic paraphernalia and threats against Warford — did not directly implicate Clark in Hardin's actions. Any implication of Clark comes indirectly through Clark's association with Hardin. *See Skinner v. Commonwealth*, 864 S.W.2d 290 (Ky. 1993) (holding that the defendant failed to establish that he should have been tried separately from his codefendants, despite his contention that he was prejudiced by the introduction of evidence about his codefendants' misdeeds). Because the decision of the Kentucky Supreme Court in Clark's appeal falls within the realm of plausible and credible results, and is not unreasonable in its analysis of law or fact, we reject Clark's habeas challenge to the joinder of his trial with that of Hardin.

## D. Letter from Capps

Finally, Clark argues that he was denied a fair trial because the prosecution failed to disclose a letter written by Capps to another jail inmate, Kevin Justis. In this letter, Capps appears to be urging Justis to commit perjury by asking Justis to testify that Hardin "jokingly" admitted to the murder of

killing other living beings. Warford's body was found tattooed with an inverted cross and wearing red sweat pants, a color which Hardin acknowledged was "a big color in this Satanism stuff." Although this evidence was not conclusive, it did tend to support the state's theory that Warford was killed out of a specific satanism-related motivation for performing a human sacrifice. *See Turpin v. Kassulke*, 26 F.3d 1392, 1399-1400 (6th Cir. 1994) (holding admissible an entry in the defendant's diary displaying her longings for wealth, because the prosecutor claimed that the defendant had arranged her husband's death out of a desire to collect on his life insurance).

Because the testimony about satanism was being offered for the proper purpose of demonstrating Clark's motive, it is subject only to the general strictures limiting admissibility contained in Kentucky Rule of Evidence 403, a rule that is substantially similar to Rule 403 of the Federal Rules of Evidence. *See Commonwealth v. English*, 993 S.W.2d 941, 944-45 (Ky. 1999). Rule 403's balancing of the probative value of such testimony against the danger of unfair prejudice is a task properly reserved for the sound discretion of the trial judge. *See Rake v. Commonwealth*, 450 S.W.2d 527, 528 (Ky. 1970).

Our review as a habeas court is even more limited in reviewing the state court's determination. "Habeas review does not encompass state courts rulings on the admission of evidence unless there is a constitutional violation." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994). No such constitutional violation exists here, because the trial court's determination that testimony about the defendants' satanic beliefs was more probative than prejudicial appears reasonable and, therefore, far from "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

The testimony, as already discussed, was probative as to the motive that the defendants might have had for killing Warford. Furthermore, the likelihood of unfair prejudice was

alleviated by the fact that the defense removed potential jurors who stated, during their voir dire examinations, that Clark's possible involvement in satanism would affect their ability to fairly and impartially try the case. Accordingly, we reject Clark's challenge to the admission of testimony about satanism.

## C.   Joinder of Clark's and Hardin's trials

Clark next argues that he was improperly joined for trial with Hardin. He alleges that standing trial with Hardin substantially prejudiced him, because most of the evidence of satanism related only to Hardin and not to him. Specifically, the prosecution elicited testimony about a sketch book of sacrilegious drawings, a handwritten book of spells, and a satanic poem. These items, however, were all possessions of Hardin, not Clark. Similarly, Clark argues that testimony about the threat that Hardin made to Warford related only to Hardin, and not to himself. In his brief, Clark points out that two of the nine justices of the Kentucky Supreme Court agreed that he was unfairly prejudiced by being tried along with Hardin.

For a defendant to receive habeas relief, he must show that the adjudication of his claim was (1) "contrary to . . . clearly established Federal law . . . or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). Clark, however, has failed to demonstrate either of these elements.

This court has held, in a Sixth Amendment habeas challenge, that a defendant must show both (1) an abuse of discretion on the part of the trial court and (2) compelling and specific prejudice in order to successfully challenge the joinder of his trial with that of a codefendant. *See Jenkins v. Bordenkircher*, 611 F.2d 162, 168 (6th Cir. 1979). Furthermore, we have found no compelling and specific prejudice where a codefendant's testimony did not expressly implicate the defendant. *See United States v. Sherlin*, 67 F.3d 1208, 1215 (6th Cir. 1995) (holding that, in a federal

prosecution, the admission of a confession by Sherlin's codefendant did not violate Sherlin's confrontation rights where his name was redacted from the codefendant's confession and the confession did not expressly implicate Sherlin).

No compelling and specific prejudice to Clark's case has been shown here. Clark and Hardin do not even present mutually antagonistic defenses. Instead, both defendants presented essentially the same alibi defense to the jury — that they were with each other at another location on the evening of the murder. At most, testimony about Hardin's satanism and threats towards Warford only implicate Clark by association, not by direct reference. But the fact that there "is a substantial difference in the amount of evidence adduced against each defendant . . . is not grounds to overturn a denial of severance unless there is a substantial risk that the jury could not compartmentalize or distinguish between the evidence against each defendant." *United States v. Lloyd*, 10 F.3d 1197, 1215 (6th Cir. 1993) (internal quotation marks and citation omitted) (ellipses in original).

In the present case, a jury could easily separate the testimony against Hardin from the testimony against Clark, because the testimony about Hardin's threats and satanic paraphernalia was not particularly complex. *See id.* at 1216 (upholding the joint trial of several defendants in a prosecution for drug trafficking because "this case, while lengthy, was not a case of such complexity that the jury could not compartmentalize the evidence"). Indeed, the state court had ample reasons to try Clark and Hardin together, because they both were charged with committing the same crime. *See Buchanan v. Kentucky*, 483 U.S. 402, 418 (1987) (recognizing that the state has an interest in proceeding with joint trials where "all of the crimes charged against the joined defendants arise out of one chain of events, where there is a single victim, and where, in fact, the defendants are indicted on several of the same counts").