RENDERED: AUGUST 21, 2008
TO BE PUBLISHED

Supreme Court of Kentucky FINAL

2007-SC-000128-DG DATE 9-11-08 EnAGrountPC.

LACY BEDINGFIELD                                          APPELLANT

ON REVIEW FROM COURT OF APPEALS
V.                          CASE NUMBER 2005-CA-000971
FAYETTE CIRCUIT COURT NO. 95-CR-000866

COMMONWEALTH OF KENTUCKY                                  APPELLEE

**OPINION OF THE COURT BY JUSTICE SCOTT**

**<u>REVERSING</u>**

The following appeal comes to this Court upon discretionary review of the Court of Appeals' opinion affirming the Fayette Circuit Court's order denying Appellant, Lacy Bedingfield's, motion to vacate his judgment and grant a new trial. At the outset, we pause to note the procedural path Appellant's case has taken.

The underlying judgment upon which Appellant's motion rests, concerns his 1996 conviction of rape in the first degree and of being a persistent felony offender. As a result of his conviction, Appellant was sentenced to twenty-five (25) years imprisonment. Appellant appealed his conviction to this Court as a matter of right, and in an unpublished memorandum opinion of the Court rendered on September 4, 1997, we affirmed the trial court's conviction.

During the pendency of this matter of right appeal, Appellant filed an RCr 11.42 motion asserting ineffective assistance of counsel on grounds that counsel did not adequately pursue DNA testing. Thereafter, this motion was denied by the trial court and the denial was subsequently affirmed by the Court of Appeals.

On July 6, 2004, Appellant filed a motion requesting release of certain physical evidence, consisting of the alleged victim's rape kit and other physical evidence, to be used in forensic testing of the semen samples contained therein. Appellant alleged that the methodologies of testing minute samples presently available were not in existence in 1996, and thus the samples would offer new forensic evidence. The results obtained from the subsequent testing give rise to Appellant's present motion to vacate judgment and to grant a new trial pursuant to CR 60.02, RCr 10.02 and RCr 10.06(1).

Appellant now claims that the results of the DNA testing performed on the forensic evidence definitively exclude him as the source of the semen recovered from the alleged victim and, therefore, give rise to sufficient justification for a new trial based on newly discovered evidence. In order to assess Appellant's claim, we now turn to the evidence and events which led to Appellant's underlying conviction.

## I.    BACKGROUND

On June 2, 1995, Officers James Stockard and Leroy Richardson were patrolling a park in the Centre Parkway area of Lexington when they were approached by a young female, T.B., wearing only a t-shirt. The officers observed that T.B. was visibly shaken, hysterical and crying. T.B. repeatedly stated that she had been raped and that her friend, K.P., may be in the process

2

of being raped. As other officers and T.B.'s mother arrived, T.B. directed the officers to the residence of Gwendolyn Bedingfield where she claimed the rape occurred. When police arrived at the location, they apprehended Appellant as he was exiting the residence. According to testimony, Appellant was not wearing a shirt and was sweating profusely. The police led Appellant to the street where T.B. identified him as the perpetrator.

After Gwendolyn Bedingfield, who was Appellant's ex-wife, and her daughter, K.P., arrived at the scene, T.B. was taken to the University of Kentucky Medical Center, where she was examined by a nurse and doctor who took samples from her for a rape kit. T.B. had a contusion on her left cheek and an abrasion on her right elbow. An examination of T.B.'s vagina discovered her hymen was not intact but detected no blood. T.B. told the medical professionals that she had been vaginally raped but claimed that Appellant did not attempt to touch or penetrate her anus.

After Appellant was arrested, he declined to voluntarily give the evidence required for the rape kit, and thus the officers obtained a warrant compelling Appellant to submit evidence. Appellant was taken to Central Baptist Hospital and cooperated fully with the examination until he was told that a swab would be inserted into his penis. At this point, Appellant objected and became upset, eventually having to be physically restrained. Testimony from one of the attending officers indicated that Appellant stated that he would tell them he did it if they would not insert the swab into his penis. According to the nurse who performed the penile swab, Appellant said he had consensual sex with T.B. but claimed he did not know she was underage. Subsequently, Appellant stated that

he made this confession only to prevent the swab from being inserted into his penis.

Blood, head hair, pubic hair and other samples taken from T.B. and Appellant were examined at the Kentucky State Police Crime Laboratory. Significantly, sperm cells were identified in a vaginal smear and a vaginal swab taken from T.B. during the rape kit examination, but the semen was insufficient to establish a blood group or to permit DNA analysis. Additionally, semen was located on certain articles of clothing T.B. was wearing. A comparison of pubic hair combings from T.B. and Appellant found no hairs from either party on the other. The Commonwealth's serologist stated that the results of his tests could not establish that Appellant had engaged in sexual intercourse with T.B.

At trial, T.B. testified for the Commonwealth. During her testimony, she stated that after school, on June 2, 1995, she and a friend, K.P., met at the Tates Creek Country Club swimming pool. While the girls were swimming, Appellant arrived at the pool. When the pool closed, the girls and Appellant went to the residence of Gwendolyn Bedingfield, K.P.'s mother and Appellant's ex-wife.

Some time thereafter Appellant left for the liquor store and returned with and drank a bottle of fortified wine. According to T.B., while the girls were watching television in the den, Appellant entered and sat next to T.B. Appellant then began to rub T.B.'s calf and thighs. Although T.B. moved her leg and told Appellant to stop, she testified that Appellant persisted in inappropriately touching her. Although her testimony on the matter is conflicting, T.B. claimed that Appellant engaged in oral sex with her on the couch. T.B. and K.P. then ostensibly went to K.P.'s room and locked the door leaning against it in order to

4

prevent Appellant from entering. According to T.B., Appellant shoved his way through the door and entered the room. T.B. testified that when she refused to lie down on the bed, Appellant grabbed her by the hair, threw her on the bed, and ripped off her bathing suit. T.B. then stated that Appellant beat her in the head with his fist while he called her derogatory names. T.B. testified that while she was on her stomach she felt Appellant's penis touch but not penetrate her anus. T.B. then claimed Appellant threatened her to remain still so he could insert his penis in her vagina or he would beat her, whereupon he then forced her legs open and engaged in vaginal rape. Immediately thereafter, he told T.B. to gather her belongings and leave.

According to T.B.'s trial testimony, as she was collecting her things, Appellant again grabbed her and took her into another bedroom. T.B. testified that he told her he "wanted it again," threw her onto the bed and once more vaginally raped her. Although T.B. testified that she told Detective Basehart about the second rape before trial, a tape of the interview played for the jury revealed that T.B. did not tell Basehart about the alleged second rape. When Appellant got up to go into another room, T.B. ran out of the house, knocking over a lamp and other items in the process.

Conversely, Appellant maintains that T.B. attempted to seduce him as a result of a dare by K.P. for T.B. to have sex with Appellant. He contends that he was sitting in the den when T.B. walked in and began to rub his chest in an attempt to entice sexual intercourse. Appellant claimed that he became angry and told T.B. to leave. However, T.B. then went to K.P.'s bedroom where he overheard her say, "did you do it," whereupon T.B. responded, "no, he wasn't

5

down for that." Appellant claimed he became irate upon hearing this and engaged in a physical struggle with T.B. while attempting to eject her from the house. Appellant was then apprehended as he was leaving the house. At trial, Appellant testified that he did not have sex with T.B. forcefully or otherwise.

Subsequently, Appellant was charged and convicted of first-degree rape and of being a persistent felony offender. Now, Appellant introduces post-conviction DNA evidence which conclusively excludes him as the source of the semen found in the rape kit. Upon a motion for a new trial, the trial court held that this evidence would not likely change the outcome of the trial with a reasonable certainty. The Court of Appeals affirmed this decision and we granted discretionary review.

## II.    ANALYSIS

Appellant argues that he is entitled to a new trial and that his motion for such was improperly denied in light of the exculpatory nature of the DNA evidence which proves that the semen sample found in the alleged victim's rape kit did not belong to him.

Preliminarily, we note that this Court has recognized the expansive advances in technology which have occurred over the course of the past decade concerning DNA testing technology. As Appellant argues, and we concede, technological advances in the field now permit testing of minute sample sizes which were, heretofore, inconceivable even as recently as a few years ago. It is a recognition of these advances in DNA testing which has led to grants of funding to the Kentucky Innocence Project though IOLTA – which gave rise to the instant case – and various other agencies to aid in testing of unresolved or "cold cases,"

6

as well as disputed rulings. See Walker v. Commonwealth, No. 2006-SC-000480-MR, 2007 WL 2404508, at *1 (Ky. August 23, 2007).

In Walker, we upheld the trial court's conviction of a rapist obtained in large part due to newly discovered DNA identification taken from samples collected some twenty (20) years prior. In doing so, we noted that advances in DNA technology allowed for testing of samples from the victim's rape kit which led to the subsequent positive identification of the unidentified perpetrator of the unsolved rape and burglary. Id. at *3. This Court in Harris v. Commonwealth, 846 S.W.2d 678, 681 (Ky. 1992) (overruled in part by Mitchell v. Commonwealth, 908 S.W.2d 100, 101-102 (Ky. 1995)), originally turned a cautious eye toward DNA technology, due largely to its relative novelty at that time and a lack of consensus among both the legal and scientific community as to how to handle DNA evidence. Ultimately, we determined, however, that such evidence, though admissible, would be determined on a case by case basis. Id. (citing United States v. Two Bulls, 918 F.2d 56, 58 (8th Cir. 1990)) (en banc granted 925 F.2d 1127 (1991)). Nevertheless, in the years subsequent, DNA testing has garnered nearly unanimous favor in the medical, scientific, and legal communities and has come to represent the gold standard of genetic identification. See, e.g., Fugate v. Commonwealth, 993 S.W.2d 931, 936-937 (Ky. 1999) (overruling Mitchell and holding that because of the widespread recognition of DNA evidence as valid and scientifically reliable such evidence was admissible per se).

Noting this evolution as such, we are now faced with the question of what weight we should attribute to newly discovered, quasi-exculpatory evidence in the form of DNA data and, thus, whether the post-conviction introduction of such

information warrants Appellant's request for a new trial under these circumstances.

**A.     Standard of Review.**

RCr 10.02 establishes that the granting of a new trial is warranted in circumstances wherein a defendant was somehow prevented from having a fair trial, or if otherwise required in the interests of justice. RCr 10.02(1). It is well-accepted that the standard for adjudging whether a new trial is warranted based upon newly discovered evidence is whether such evidence carries a significance which "'would with reasonable certainty, change the verdict or that it would probably change the result if a new trial should be granted.'" E.g., Collins v. Commonwealth, 951 S.W.2d 569, 576 (Ky. 1997) (quoting Coots v. Commonwealth, 418 S.W.2d 752 (Ky. 1967)); see also Caldwell v. Commonwealth, 133 S.W.3d 445, 454 (Ky. 2004). Likewise, we have consistently held that evidence which is merely cumulative, collateral, or which impeaches a nonmaterial witness is insufficient to warrant a new trial. See Foley v. Commonwealth, 55 S.W.3d 809, 814 (Ky. 2000). Logically, however, the converse is equally true. When newly discovered evidence is of such a nature that it is manifest to the conviction, substantially impacts the testimony of a material witness, or would have probably induced a different conclusion by the jury had the evidence been heard, then assuredly, the interests of justice demand that a criminal defendant is entitled to have such evidence set before the court.

We review the denial of a motion for a new trial to determine whether such decision was an abuse of discretion. Id.; Collins, 951 S.W.2d at 576; Epperson v. Commonwealth, 809 S.W.2d 835, 841 (Ky. 1991).

### 1. Timeliness of Motion for a New Trial

We note that typically RCr 10.02 motions based upon newly discovered evidence should be made within one year of the rendering of a final judgment. However, RCr 10.06(1) allows entry of a motion "for a new trial based upon the ground of newly discovered evidence . . . made within one (1) year after the entry of the judgment *or at a later time if the court for good cause so permits*." (emphasis added).

Similarly, CR 60.02 permits,

> On motion a court may, upon such terms as are just, relieve a party or his legal representative from its final judgment, order, or proceeding upon the following grounds: (a) mistake, inadvertence, surprise or excusable neglect; (b*) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59.02*; [ten days after judgment] (c) perjury or falsified evidence; (d) fraud affecting the proceedings, other than perjury or falsified evidence; (e) the judgment is void, or has been satisfied, released, or discharged, or a prior judgment upon which it is based has been reversed or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (f) *any other reason of an extraordinary nature justifying relief. The motion shall be made within a reasonable time, and on grounds (a), (b), and (c) not more than one year after the judgment, order, or proceeding was entered or taken*. A motion under this rule does not affect the finality of a judgment or suspend its operation.

(emphasis added). However, as we recognized in Bowling v. Commonwealth, 168 S.W.3d 2, 5 (Ky. 2004), "[u]nlike RCr 10.06(1) . . . CR 60.02 contains no provision for extending the time limit past one year" for reasons of newly discovered evidence. Yet, as we implicitly noted in Bowling, and as is explicitly

9

present in the rule, justifications under CR 60.02(d), (e), or (f) may be asserted outside of this one year time frame. See Bowling, 168 S.W.3d at 6 n.3 (quoting Hartford Accident & Indem. Co. v. Lewis, 296 S.W.2d 228, 231 (Ky. 1956)) (noting that CR 60.02(f) must be explicitly invoked to be applicable).

While such consideration is not an issue in the present instance as Appellant, here, specifically pleaded relief under both RCr 10.06(1) and CR 60.02(f), we now call into question the efficacy of a rule which fails to acknowledge that an "extraordinary nature" may likewise exist under CR 60.02(b), such is the case here. An "extraordinary" circumstance under CR 60.02(f) always establishes good cause under RCr 10.06(1) and thus, if good cause is shown, a motion for a new trial can be made outside of the one year limitations period. Here, it should not be overlooked that the DNA technology which gave rise to this newly discovered evidence did not exist in the time frame when it could have been timely brought under CR 60.02(b). Despite the disconnect between the permissive time frame of RCr 10.06(1) and the more rigid time frame under CR 60.02, Appellant is permitted to make a motion for a new trial because he proceeded under both RCr 10.06(1) and CR 60.02(f). Therefore, as Appellant has demonstrated good cause, the one year limitation is not applicable here.

**B.     DNA Evidence.**

Despite the prevalence of guidance concerning the grant of a new trial, the circumstance at hand appears to be an issue of first impression in Kentucky. It would seem that this Court has never thoroughly examined the exculpatory effect of newly discovered DNA evidence in this context. However, many of our sister

10

jurisdictions, acknowledging the accuracy, effectiveness, and implicit interests of justice inherent in DNA testing have recognized the exculpatory effect that such evidence may have in post-conviction criminal proceedings.

In People v. Dodds, 801 N.E.2d 63, 67-68 (Ill. App. Ct. 2003), appellant, convicted of murder, initiated a motion for a new trial based on newly discovered DNA evidence. The motion was based, in part, on new "non-match" DNA evidence removed from blood stains, purported to be the victim's, found on appellant's pants. Id. In that vein, the appellant argued that, at his trial, the state relied heavily on the blood evidence as indicative of his guilt. Conversely, the state maintained that the blood evidence was but one indication of guilt, along with appellant's confession. Noting the relative novelty of the use of post-trial "non-match" DNA evidence, the Dodds court defined such evidence as:

> Negative or non-match results are those, as in the instant case, where the results show that the victim was not the source of a certain sample (defendant's clothing here), but which results do not necessarily exclude the defendant as the perpetrator. In other words, although defendant here may have shown that the blood on his clothing was not that of the victims, this does not rule him out as the murderer.

Id. at 68 n.2 (citing Comment, Motions for Postconviction DNA Testing: Determining the Standard of Proof Necessary in Granting Requests, 31 Cap. U.L.Rev. 243, 264 (2003) (the "absence of DNA does not necessarily mean the perpetrator was not in contact with the crime scene or victim. Similarly, the absence of a victim's DNA on a perpetrator or his property does not mean there was no contact between the two").

Recognizing that post-conviction, newly discovered, non-match DNA evidence – that which, standing alone, neither explicitly exculpates or inculpates

11

a defendant – is rarely addressed in case law, the Dodds court sought to discern the legal significance of such evidence. Id. at 68-69 (citing 31 Cap U. L. Rev. at 245). In doing so, the court articulated that in order to warrant a claim of actual innocence, the evidence should be new, noncumulative evidence which was not obtainable with due diligence during trial and that would probably induce a different result upon retrial. Id. at 69.

Similarly, we are now faced with a situation of non-match DNA evidence discovered years after the alleged commission of the crime. Moreover, what is likewise noteworthy is that the Dodds court, as in the present instance, reviewed the newly discovered evidence despite the fact that appellant had already confessed to the crime. Id. at 67. The court justified its decision by relying on the compelling exculpatory effect of DNA evidence as well as the dubious nature of the confession. See id. at 71.

Likewise, in In Re Bradford, 165 P.3d 31, 32 (Wash. App. 2007), after serving his full sentence, appellant appealed his rape and burglary convictions based on newly discovered DNA evidence. Again, the court found that non-match DNA, which did not conclusively exculpate the defendant, supported a new trial. Using techniques not available at the time of the trial (1995), the laboratory extracted the DNA of an unidentified male from the surface of tape used to secure a mask that the perpetrator had forced the victim to wear during the commission of the crime. Id. at 32-33. Subsequent DNA testing excluded appellant as a source of the specimen found on the tape. Id. The court, while acknowledging that this new evidence did not positively exclude appellant as the

person responsible for of the crime, proposed that this new evidence would minimize the probability that he was the perpetrator. See id.

Similar to Dodds, the Bradford court was faced with the conundrum of granting a new trial despite the appellant's confession. Id. at 32. The trial court below had found that the jury relied heavily on Bradford's confession, but that its reliability was questionable. Id. 32. Recognizing that this newly discovered evidence would probably change the result of the initial trial, the Washington Court of Appeals determined that this was a question for the jury and that they should have the opportunity to determine whether the confession was reliable or not in light of the newly discovered DNA evidence. Id. at 35.

In Commonwealth v. Reese, 663 A.2d 206, 210 (Pa. Super. 1995), a convicted rapist was granted a new trial based on newly discovered non-match DNA from the victim's vaginal smear. Laboratory tests conducted on the sperm found on the vaginal smear concluded that Reese was not the source of the semen. Id. The Commonwealth's principal argument on appeal was that the new evidence did not exculpate the defendant, but merely showed that the victim and her live-in boyfriend had engaged in intercourse prior to the rape. Id. at 209. This theory was strengthened by the victim's testimony that she was unsure whether or not the assailant had ejaculated. Id. Nevertheless, the court concluded that DNA evidence which excludes a defendant as the donor of semen may be sufficient to create reasonable doubt sufficient enough to secure an acquittal. Id. at 208.

In Brewer v. State, 819 So.2d 1169 (Miss. 2002), appellant was granted an evidentiary hearing to determine if he should receive a new trial. In 1995,

13

appellant was sentenced to death for the rape and murder of a female child. Id. at 1171. In 2001, appellant moved for DNA testing to be conducted on certain evidence. Subsequent testing discovered semen from two unknown male donors on the victim's body; however, the appellant's DNA was not present. Id. at 1174. The circumstantial evidence against appellant was mountainous. He was the only person with the children during the time period in which the rape and murder took place; experts testified that the bite marks on the child's body were his; and a team of dogs, following the scent of his clothing, eventually led them to the site where the victim's body was found. Id. at 1173 n. 1. Nevertheless, the court granted the evidentiary hearing, recognizing the exculpatory nature of the DNA evidence and finding that the trial court should determine whether it was sufficient to induce a reasonable fact finder to reach a different result. Id. at 1174.

In the present instance, we are confronted with the stark reality that Appellant was convicted based, at least in part, on suppositions that we now know to be fundamentally false: namely, that Appellant was the source of semen identified from T.B.'s vaginal swab and that taken from her clothing. Moreover, we simply cannot ignore the permeating and saturating effect that the evidence, which was construed to identify Appellant as the source of the semen, played in enhancing the viability and credibility of *all* of the Commonwealth's arguments. And although we are mindful of the circumstantial evidence which would seem to inculpate Appellant, we are likewise heedful of, and troubled by, the numerous inconsistencies in the testimony and evidence presented at trial.

14

The semen evidence collected from the rape kit and clothing played a substantial, if not central, role in Appellant's trial. The Commonwealth focused on the semen evidence in calling Edward Taylor of the Kentucky State Police Crime Lab who testified that trace amounts of semen and sperm cells were collected from the vaginal smear and the vaginal swabs, as well as from the clothing. Taylor likewise gave testimony concerning the significance of the blood type testing and remarked that eighty percent of individuals secrete their blood type in their body fluids and that both Appellant and T.B. were secretors. While Taylor testified that he could not draw conclusive results from the tests to prove Appellant as the source of the semen, he gave a detailed explanation as to the possibility of Appellant's blood type secretions being mixed with T.B.'s vaginal fluid secretions.

Moreover, and of significant import, is the fact that the Commonwealth argued throughout Appellant's trial that the presence of semen corroborated T.B.'s allegations that she was raped because she had not had sex with anyone else that day. In fact, the Commonwealth excused Appellant's contention that the semen was from a sexual encounter with someone other than Appellant as a "bizarre theory" given the young age of T.B. and the fact that she had been at school and at the pool prior to the alleged incident. As to her presence at the pool, the Commonwealth emphasized this as further evidence that the semen must have belonged to Appellant, because if it was from someone else it would have been washed away. Likewise, the Commonwealth also argued that the semen discharge found on T.B.'s pants had to be from recent intercourse.

The foregoing problems are correspondingly buttressed by the numerous and troubling testimonial inconsistencies involved in Appellant's trial. The primary witness, T.B., contradicted many of her previous statements both during her testimony and before trial. Additionally, the only other alleged witness, K.P., also gave conflicting and inconsistent accounts. Moreover, it cannot be ignored that there were serious credibility problems with both of these witnesses. K.P.'s mother conceded that she "was not very good at telling the truth," and her testimony would seem to substantiate this conclusion; K.P. had also made at least three prior false rape allegations against her mother's previous boyfriends. Similarly, K.P. had just been released from an institution where she was being treated for depression the day prior to the alleged event.

T.B.'s testimony at trial differed in many regards from the statements that she gave to Detective Basehart after the rape. T.B. told Basehart in a taped interview prior to trial that Appellant did not attempt anal intercourse and that she was never on her stomach during the incident. However, at trial, she denied that she told Basehart this and testified that she was on her stomach and Appellant attempted to have anal intercourse with her. T.B.'s trial testimony was similarly inconsistent with statements she gave to the attending physician at the hospital. The physician testified that when he specifically questioned T.B. about whether there was any contact with the anus, she said there was none. Further troubling is that T.B.'s claim that Appellant engaged in oral sex with her did not surface until cross examination at trial. Furthermore, T.B. testified on direct examination that Appellant raped her a second time in a separate bedroom and that she informed Detective Basehart of this. However, the taped interview with the

16

Detective revealed that no such statement was made prior to trial. When asked whether Appellant had done anything to her apart from rubbing her that made her uncomfortable, T.B. mentioned nothing about the alleged oral sex.

T.B. further testified that her one-piece bathing suit was ripped off by Appellant during the alleged rape. However, when asked on cross-examination how her bathing suit came off, she said that she wasn't sure and that it must have fallen off. Moreover, at trial she denied telling Basehart that Appellant ripped the swimsuit off, though the tape revealed that she, indeed, had done so. T.B.'s testimony regarding the bathing suit is especially troubling considering that it was of a one-piece design and T.B. consistently testified that her t-shirt remained on throughout the encounter.

There are also marked inconsistencies between T.B. and K.P.'s stories. For instance, K.P. testified that she witnessed the alleged oral sex in the living room. However, T.B. did not mention the oral sex until cross-examination and testified that K.P. did not know about the incident in the living room until she told her in the bedroom. Although K.P. testified that Appellant forced T.B. to allow him to perform oral sex, she could not explain how Appellant managed to push aside T.B.'s shorts and bathing suit in order to put his mouth to her vagina. K.P. also testified that she witnessed the anal intercourse. She stated that T.B. told Appellant that the anal intercourse was painful and asked Appellant to allow her to turn around. K.P. testified that Appellant obliged this request and the vaginal rape occurred when T.B. turned around. As we have noted this is contrary to T.B's testimony. Assuredly, these testimonial inconsistencies are unsettling

17

Thus, the circumstantial evidence in this case was far from irrefutable. Ultimately, the substantive exculpatory nature of the newly discovered DNA evidence coupled with the blatant testimonial inconsistencies of the material witnesses and the substantial impact which this newly discovered evidence has upon said testimony, along with the fact that this evidence would probably induce a different conclusion by a jury, all serve to warrant a new trial to avoid a substantial miscarriage of justice. RCr 10.02

## III.    CONCLUSION

For clarity's sake we emphasize:  the presence of sperm which DNA testing proves did not belong to Appellant does not exonerate him; however, the presence of this new evidence does cast a long shadow and assuredly merits consideration in the form a new trial. It cannot be overlooked that in Appellant's initial trial, all other arguments were enhanced and corroborated by the supposition that the sperm found belonged to Appellant. Indeed, this theme was central to the Commonwealth's prosecution. Because the technology was not available for Appellant to refute that claim, Appellant was left to rely on his word against that of the Commonwealth. This new evidence is substantial, if not pivotal, and we are inclined to believe that it is precisely the type of evidence that is envisioned by the rule and that may change the result if a new trial were granted. See Commonwealth v. Tamme, 83 S.W.3d 465, 468 (Ky. 2002); RCr 10.02.

Accordingly, we hereby reverse the Court of Appeals' decision affirming, vacate Appellant's sentence pursuant to CR 60.02, and grant his motion for a

new trial based upon newly discovered evidence. This matter is therefore remanded to the trial court for further proceedings consistent herewith.

Minton, C.J., Abramson, Cunningham, Noble, and Schroder, JJ., concur.

Venters, J., not sitting.

COUNSEL FOR APPELLANT:

Melanie L. Lowe
Assistant Public Advocate
Department of Public Advocacy
100 Fair Oaks Lane Ste. 301
Frankfort, KY 40601

COUNSEL FOR APPELLEE:

Jack Conway
Attorney General of Kentucky

James Daryl Havey
Office of the Commonwealth's Attorney
116 N. Upper St. Ste. 300
Lexington, KY 40507-1161

Traci Courtney Caneer
Office of the Commonwealth's Attorney
116 N. Upper St. Ste. 300
Lexington, KY 40507-1161