Garr Keith HARDIN and Jeffrey Dewayne Clark, Appellants

v.

COMMONWEALTH of Kentucky, Appellee.

No. 2011–SC–000722–TG.

Supreme Court of Kentucky.

April 25, 2013.

Jason Kreag, The Innocence Project, New York, NY, Larry David Simon, Louisville, KY, Linda A. Smith, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Counsel for Appellant, Garr Keith Hardin.

Kathleen Kallaher Schmidt, Assistant Public Advocate, Department of Public Advocacy, Frankfort, KY, Theodore S. Shouse, Louisville, KY, Counsel for Appellant, Jeffrey Dewayne Clark.

Jack Conway, Attorney General, Perry Thomas Ryan, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, KY, Counsel for Appellee.

Opinion of the Court by Justice CUNNINGHAM.

We accepted transfer to consider the issue of post-conviction DNA testing in a non-capital case. Appellants herein were convicted of the 1992 murder of Rhonda Sue Warford, based on highly circumstantial evidence. Both were sentenced to life imprisonment. Appellants, now represented by the The Innocence Project, seek the release of certain physical evidence recovered from the crime scene (namely, unidentified hairs found in the victim's hand) for DNA testing-testing which was unavailable at the time of Appellants' trial and which, they claim, will prove their innocence. We hold that, under the facts of this case, Appellants are entitled to the testing they seek.

## BACKGROUND

On April 1, 1992, at approximately 7:00 p.m., nineteen-year-old Rhonda Sue Warford went to the Kroger grocery store near her Louisville home. When she arrived home around 7:30 p.m., she told her mother that as she was leaving the parking lot, a strange man harassed her and told her he wanted to marry her. Just after midnight, Rhonda left home and never returned. Family members surmised that she was going back to the grocery. Three days later, authorities found her dead body approximately fifty miles away in a remote area of Meade County. Police officers preserved the evidence at the scene, including the placement of plastic bags over the victim's hands. The medical examiner concluded that the victim's death was the result of multiple stab wounds following a close-range violent struggle, as evidenced by defensive wounds on the victim's hands. Evidence obtained at the autopsy included three hairs recovered from the victim's right hand and hairs found on the victim's red sweatpants. Fingernail scrapings were obtained as well.

At the time of the murder, Rhonda was dating Appellant, Garr Keith Hardin. Appellant, Jeffrey Dewayne Clark, was a close friend of Hardin's and had socialized with Rhonda's sister, Michelle, at one time. At the time of the murder, Hardin and Clark were 22 and 21 years old, respectively. Following discovery of the body, Rhonda's mother told police she believed that Rhonda, Michelle, and both Appellants were involved in Satanism. Thereafter, the authorities zeroed in on Appellants as suspects in the murder.

Appellants were interviewed multiple times and denied any involvement in the murder. They claimed to have been together in Louisville at the time in question. Clark denied owning a knife or being involved in Satanism. Hardin initially de-

nied owning a knife, but subsequently admitted to such and also to being involved in Satanism. Pursuant to search warrants, knives were found in Clark's residence and numerous occult related items and knives were found in Hardin's residence. None of the knives found were determined to be linked to the murder. A tire cast obtained from the crime scene did not match any vehicles Appellants were known to have access to.

A few weeks after the murder, a forensics report was issued analyzing the hairs recovered at the autopsy. The hairs were analyzed using the available technology at the time, i.e., microscopic comparison to hair standards taken from the victim, Hardin, and Clark. Of the three hairs recovered from the victim's right hand, two were gray and did not match the victim, Hardin, or Clark. The third hair was deemed similar to the victim's own hair. Several hairs were recovered from the victim's red sweatpants as well, one of which was analyzed to have characteristics similar to Hardin's head hair. The rest of the hairs recovered from the pants were not microscopically similar to those of the victim, Hardin, or Clark.

The police concluded that Hardin and Clark had been involved in satanic worship, which became the Commonwealth's theory at trial as to Appellants' motive for the murder. Appellants were tried jointly in a seven-day trial in February and March, 1995. There were no witnesses who could place Appellants with the victim that night. Despite the Commonwealth's theory that the killing was Satanism related, the Commonwealth's expert on the subject testified the murder did not appear to be a satanic ritual sacrifice. No motive other than Satanism was offered.

The physical evidence the Commonwealth asserted linked the Appellants with the murder consisted of (1) a single finger-print matching the victim's which was lifted from the interior back seat passenger window of Clark's car; and (2) the one hair described as similar to Hardin's found on the victim's red sweatpants.

As to the fingerprint, it was undisputed that the victim, who was dating Hardin and was acquainted with Clark, had been in Clark's car on a number of occasions. The Commonwealth tried to assert that the print was fresh, thus disproving Clark's statement to police that the victim had not been in his car since December of 1991 (approximately four months before the murder). However, the Commonwealth's fingerprint expert conceded that fingerprints cannot be time-dated.

The Commonwealth further asserted that the one hair deemed similar to Hardin's found on the victim's pants disproved Hardin's statement of when he had last seen her. Hardin claimed he last saw the victim on March 27 and 28, 1992, when he had spent the night at her house. The victim's mother testified that the red sweatpants the victim was wearing at the time of her death had been laundered on the night of April 1, 1992. The Commonwealth asserted that the presence of one of Hardin's hairs on the freshly washed pants did not coincide with his story that he had not seen her since March 27 and 28.

The most incriminating testimony was offered by Clifford Capps, who had shared a cell with Clark at the Meade County jail. Capps claimed that Clark confessed twice to the murder, once jokingly and once seriously. Evidence was also presented through various witnesses showing that Appellants had an interest in knives, that both were heavily involved in Satanism, and that both had made false statements to law enforcement.

Appellants presented an alibi defense that they were in Louisville during the

time frame at issue, not in Meade County where the victim was killed. Defense counsel argued that the true perpetrator would not be known until a match was found for the two unidentified gray hairs found in the victim's hand. The Commonwealth argued that the hairs could belong to the sheriff.

After Appellants' 1995 trial, a letter surfaced indicating that Clifford Capps may have committed perjury at the trial when he claimed Clark confessed to the murder. In the letter, dated November 17, 1992, Capps attempted to solicit another inmate, Kevin Justis, to fabricate testimony to bolster Capps' story that Clark had confessed. Capps' apparent motive in incriminating Clark was to gain favor with the Commonwealth in order to receive shock probation. Appellants claimed Capps' letter was newly discovered evidence and became the basis for their motion for a new trial. The trial court's denial of this motion was also raised as an issue on direct appeal to this Court. Appellants argued therein that if Capps was soliciting someone else to commit perjury to bolster his testimony, he may very well have committed perjury himself and, hence, a new trial was warranted.

We concluded the trial court did not err in denying the motion on grounds that this newly discovered evidence, with reasonable certainty, would not have changed the verdict had a new trial been granted. *Hardin v. Commonwealth*, 95–SC–000461–MR (Ky. Aug. 29, 1996); *Clark v. Commonwealth*, 95–SC–000453–MR (Ky. Oct. 2, 1997). This Court ultimately affirmed Hardin's and Clark's convictions, although acknowledging that the evidence against them was "highly circumstantial." *Hardin v. Commonwealth, Id.*, slip op. at 17.

### REQUEST FOR DNA TESTING

In 2009, the Innocence Project, Inc. and the Department of Public Advocacy Kentucky Innocence Project (hereinafter collectively referred to as the Innocence Project) agreed to represent Hardin and Clark, respectively, to secure DNA testing of the hairs found on the victim, as well as the victim's fingernail scrapings. The Innocence Project believes DNA testing has the potential to identify James Whitley as the actual perpetrator. Whitley allegedly confessed to the murder shortly after it occurred. Alternatively, if the DNA did not belong to Whitley, counsel proposed that it could be compared to the Kentucky and FBI DNA databases of convicted offenders.

The Innocence Project is in possession of evidence containing Whitley's DNA and proposes the testing be done at an agreed upon, fully accredited, private DNA lab. The Innocence Project offers to cover the costs of the testing. It should be noted here that the victim's fingernail scrapings cannot presently be located.

We pause momentarily to discuss the matter of James Whitley's confession. Eletha Madison, a good friend of the victim, testified at the 1993 grand jury proceedings which led to Appellants' indictments. In an affidavit dated May 6, 2009, Madison claimed to have testified that the victim used to spend time with Whitley and another friend, Pamela Gibson. Shortly after the victim's death, Gibson told Madison that Whitley had confessed (to Gibson) that he had committed the murder. Whitley told Gibson that he picked up Warford from the Kroger parking lot and took her to a field in Meade County. The two then got into an altercation and Warford threatened to report Whitley's behavior to his parole officer. Whitley became enraged and stabbed Warford multiple times, killing her. Additionally, in the 2009 affidavit, Madison further stated that, although Whitley was in

his early thirties at the time, he had some gray hair. Whitley is currently on probation and lives near Meade County.

The Commonwealth rejected the Innocence Project's request to release the evidence for DNA testing. In July, 2009, Appellants filed motions in the Meade Circuit Court again seeking release of the evidence for testing, from which they anticipated filing motions to vacate their convictions pursuant to this Court's decision in *Bedingfield v. Commonwealth*, 260 S.W.3d 805 (Ky.2008).

In an order entered on January 14, 2010, the Meade Circuit Court found that it did have the authority to grant DNA testing on grounds that a court always has the inherent authority to correct a manifest injustice. In determining whether a manifest injustice occurred, the trial court considered whether the information now available through DNA testing "constitutes new evidence which could reasonably have affected the outcome of the trial." The court denied the motion, stating in part:

> Regardless, of the failure of the gray hair(s) to match Ms. Warford, Mr. Clark, or Mr. Hardin, the subject hair(s) and the alternate perpetrator theory is not new to either defendant. To now identify the source of those hair(s) would not be a new breath of fresh air for either Mr. Clark or Mr. Hardin and would certainly not serve to exonerate either of them. This is particularly true when one considers the fact that the jury who convicted the defendants knew that the hair(s) were from an unidentified source but, nevertheless, found sufficient evidence elsewhere to adjudge Mr. Clark and Mr. Hardin to be guilty beyond a reasonable doubt.
>
> In summary, this Court finds that there is nothing "new" to be learned from DNA analysis that could exculpate either defendant. After carefully considering the facts applicable to the current motions, this Court finds that there is no evidence that any injustice has occurred. . . .

Accordingly, the trial court denied Appellants' motion for release of the evidence for DNA analysis. Appellants appealed this ruling to the Court of Appeals and we granted transfer.

■ On appeal, Appellants argue that DNA testing methods now available could conclusively identify the source of the hairs found in the victim's hand, thereby establishing their innocence while simultaneously identifying the actual perpetrator. Appellants contend that the results of the DNA testing will constitute newly discovered evidence from which, using the procedural path recognized by this Court in *Bedingfield*, they would then file timely motions to vacate their convictions pursuant to RCr 10.02 or CR 60.02.

Appellants, therefore, ask this Court for the following relief: (1) an order reversing the Meade Circuit Court's denial of DNA testing; (2) an order directing the Commonwealth to release the hairs to a fully-accredited private lab for DNA testing to be paid for by the Innocence Project and/or the Kentucky Innocence Project; and (3) an order directing the Meade Circuit Court Clerk, the Commonwealth's Attorney's Office in Meade County, the Meade County Sheriff's Office, the Kentucky State Crime Laboratory, the Meade County. Coroner, and any other agencies that at any time maintained possession of the physical evidence in this case to perform a physical search for the victim's fingernail scrapings that were collected during the autopsy proceedings.

The Commonwealth urges this Court to reject Appellants' request. The Commonwealth argues that KRS 422.285 only provides for post-conviction DNA testing in

capital cases. The Commonwealth further argues that, KRS 422.285 notwithstanding, the trial court properly denied the motion on grounds that no manifest injustice would result from the denial of testing as the results of the testing would not exonerate Appellants, but would, at best, implicate a third party.

While KRS 422.285 provides for post-conviction DNA testing for capital defendants, Kentucky has no statutory procedure regarding DNA testing for a non-capital defendant. The United States Supreme Court has recognized a limited procedural due process right for defendants to secure post-conviction DNA testing to prove their innocence. *District Attorney's Office for Third Judicial Dist. v. Osborne,* 557 U.S. 52, 129 S.Ct. 2308, 174 L.Ed.2d 38 (2009) and *Skinner v. Switzer,* —— U.S. ——, 131 S.Ct. 1289, 179 L.Ed.2d 233 (2011). In *Skinner,* the Court held that a claim for post conviction DNA testing is cognizable under 42 U.S.C. § 1983.

This Court has previously recognized a non-capital defendant's right to a new trial based on newly discovered quasi-exculpatory DNA evidence. *Bedingfield v. Commonwealth,* 260 S.W.3d 805 (Ky.2008). In *Bedingfield,* the alleged victim, T.B., accused Bedingfield of rape. Semen was recovered from the victim and her clothing; however, it was of an insufficient quantity to establish a blood group or permit DNA analysis under the methods available at the time. T.B. claimed she had not had sexual relations with anyone else that day. At Bedingfield's 1996 trial, the Commonwealth argued that the semen was his. The case ultimately came down to whether the jury believed T.B. or Bedingfield. The jury found Bedingfield guilty of first-degree rape and he was sentenced to 25 years in prison.

In 2004, Bedingfield filed a motion requesting release of certain physical evidence, including the victim's rape kit, to be used in forensic testing of the semen samples contained therein. Bedingfield alleged that the methodologies now available for testing minute samples were not in existence when he was tried and, thus, the samples would offer new forensic evidence. The results of the DNA testing performed on the forensic evidence conclusively excluded Bedingfield as the source of the semen recovered from the alleged victim. Thereafter, Bedingfield filed a motion for a new trial pursuant to CR 60.02, RCr 10.02, and RCr 10.06(1). The trial court denied the motion on grounds that the evidence would not likely change the outcome of the trial with a reasonable certainty. The Court of Appeals affirmed, and we granted discretionary review and reversed that decision.

In *Bedingfield,* we recognized the significance of DNA testing and determined that Bedingfield's motion was timely, even eight years after his conviction. This Court concluded by finding that the trial court abused its discretion in denying Bedingfield a new trial based on the newly discovered DNA evidence:

> It cannot be overlooked that in Appellant's initial trial, all other arguments were enhanced and corroborated by the supposition that the sperm belonged to Appellant. Indeed, this theme was central to the Commonwealth's prosecution. Because the technology was not available for Appellant to refute that claim, Appellant was left to rely on his word against that of the Commonwealth. This new evidence is substantial, if not pivotal, and we are inclined to believe that it is precisely the type of evidence that is envisioned by the rule and that may change the result if a new trial were granted.

*Bedingfield,* 260 S.W.3d at 815. *See Commonwealth v. Tamme,* 83 S.W.3d 465, 468

(Ky.2002); RCr 10.02. Having so held, we vacated Bedingfield's sentence pursuant to CR 60.02 and granted his motion for a new trial based upon newly discovered evidence.

While the Appellants in the present case wish to pursue the same procedural path approved by this Court in *Bedingfield,* the Commonwealth refuses to release the evidence. Without the ability to test the evidence, Appellants cannot proceed. Per our decision in *Bedingfield,* we conclude the trial court abused its discretion in denying Appellants' motion.

This Court previously recognized, on direct appeal, that Appellants were convicted based on highly circumstantial evidence. The physical evidence the Commonwealth asserted linked Appellants with the murder consisted of the one fingerprint found in Clark's car and the one hair deemed similar to Hardin's found on the victim's sweatpants. However, this evidence was far from conclusive of the guilt of either Appellant, as the victim was dating Hardin and it was undisputed that she had been in Clark's car in the past.

While the Commonwealth's theory of the case was that the killing was Satanism related, the Commonwealth's expert opined it did not appear to be a satanic ritual killing. Given the medical examiner's conclusion that the victim was killed following a violent close-range struggle, if the unidentified hairs found in the victim's hand were matched to Whitley or to another individual in the Kentucky or FBI DNA database of convicted offenders, we believe this evidence "would with reasonable certainty, change the verdict or that it would probably change the result if a new trial should be granted." *Bedingfield,* 260 S.W.3d at 810 (internal citations and quotation marks omitted). The Commonwealth urges us to deny testing on grounds that, even if the hairs are shown to belong to Whitley, this would only serve to incriminate a third person and not exculpate Appellants.

First of all, we are mystified, if not amazed, that the Commonwealth has such little interest in the possibility that DNA testing might lead to the prosecution and conviction of a guilty person heretofore uncharged and now at large upon the Commonwealth. Secondly, we rejected this identical argument in *Bedingfield.* At trial, the Commonwealth's theory of the case was that the Appellants acted alone. The Commonwealth presented no evidence of a third party's involvement.

■ Lastly, we proclaim that evidence admitted into criminal trials in this state belongs to the Commonwealth of Kentucky. It does not belong to the Commonwealth's Attorney. The latter is charged with the duty to preserve and protect the integrity of the evidence, not to hoard it. The Innocence Project in this case offered to have the evidence tested at a fully-accredited lab and to pay for the expense of testing. Reasonable as this proposal may seem, it is not enough. Safeguards must be in place to protect the chain of custody and integrity of the evidence while it is being tested. The trial court is in the best position to establish the appropriate guidelines and monitor the process.

We hold that Appellants are entitled to the testing they seek. Accordingly, the order of the Meade Circuit Court denying Appellants' motion is reversed and the case remanded for further proceedings consistent with this opinion.

All sitting. All concur.